### In re BOYDEN.

(District Court, M. D. Pennsylvania.   November 8, 1904.)

#### No. 270.

1. BANKRUPTCY—DISCHARGE—CONCEALMENT OF PROPERTY.

While in bankruptcy proceedings instituted prior to the amendment of Bankr. Act Feb. 5, 1903, c. 487, 32 Stat. 797 [U. S. Comp. St. Supp. 1903, p. 409], the fact that the bankrupt had obtained property on credit by means of false statements is not ground for denying him a discharge, yet statements made by him a short time before his bankruptcy may be considered on the questions whether he made a false oath to his schedules, or has fraudulently concealed property from his trustee; and he may properly be called upon to explain discrepancies between the extent of his property as given in his statements and as realized by the trustee, and his right to a discharge be made to depend on whether he has satisfactorily done so.

2. SAME.

Objections to the discharge of a bankrupt on the ground of false oath to his schedules and fraudulent concealment of property *held* not sustained by a comparison between his schedules and a written statement of his assets and liabilities made a short time before his bankruptcy, where the discrepancy between the value of his assets as shown by the statement and as estimated in the schedule and realized by the trustee, while large, was due principally to overvaluation in the statement, and there was no evidence that any of the property shown by the statement had in fact been fraudulently disposed of or concealed.

In Bankruptcy.   On exceptions to report of C. A. Van Wormer, referee, overruling objections to bankrupt's discharge.

W. A. Skinner, for the exceptions.
John D. Miller, for bankrupt.

ARCHBALD, District Judge. · On December 20, 1902, the respondent, Charles Boyden, went into voluntary bankruptcy, and the same day filed schedules, in which his liabilities, direct and contingent, were fixed at $95,378.11, and his assets at $25,663. He was engaged for several years previous in the combined business of lumbering, contracting, and carrying on a store for the sale of hardware and builders' supplies at Susquehanna, Pa.; and on September 3, 1902—about three months before he became bankrupt—he made a detailed statement in writing to the First National Bank of that place of his financial condition, in which his liabilities were fixed at $26,000 and his resources at $86,700, thus making out that he was worth $54,700. In view of his almost immediate bankruptcy in December following and the wide discrepancy between what is thus stated and the showing made in his schedules, which is still further increased by the insignificant results obtained in the settlement of his estate, it is contended that his failure was not an honest one, and that he has manifestly made away with a material portion of his property; thus being guilty of a false oath in swearing to his schedules, as well as a fraudulent concealment from his trustee, on both of which grounds his discharge is opposed. Previous statements of a similar character to that made to the bank had been given by the bankrupt in October, 1901, to R. G. Dun & Co., and in January, 1902, to Bradstreet's Commercial Agency, in each of which

he represented that he was worth about the same amount. In the present state of the law, if property was shown to have been obtained on credit upon the strength of either of them, being materially false, it would have been sufficient to bar a discharge; and, while reliance cannot be had upon that here, the bankruptcy proceedings antedating the change in the law, it serves to indicate the importance to be attached to it, according to the legislative mind. In view of this, as well as upon general principles, the bankrupt may properly be called upon to explain the discrepancy between the extent of his property as given in these statements and as realized by his trustee, and his right to a discharge be made to depend upon whether or not he has satisfactorily done so. There is this precaution, however, to be observed: Bearing in mind that it is the concealment or suppression of property that is to be reached, the case is not to be disposed of upon a mere comparison of assets and liabilities as given by the bankrupt, nor upon balances struck between them. It is not, in other words, to be made a mere matter of figures, which at the most are representative only, and depend for their value on how nearly they are correct. But, taking the statements as a whole, as concrete declarations by the bankrupt with regard to the extent and character of the property possessed by him at the time, to which, in the first instance, he is to be held, the question is whether he has sufficiently accounted for the variance which appears. If he has not, he may well be considered as having made away with or appropriated the property which is unaccounted for or its proceeds; and, on the other hand, if he has, he is entitled to be absolved from any such charge.

Except for the purpose of incidental comparison, it is not necessary to go back of the statement made to the bank in September, three months prior to the filing of the petition. This is so close to the latter date as to enable us the easier to follow and detect any change; and, on the other hand, if nothing is disclosed in that connection, it is useless to go back of it. Taking it up item by item, let us see what result is reached.

The first is merchandise on hand, the value of which is given at $10,000, with $1,000 additional in transit. Just what this consisted of is not stated, but it must be understood as intended to cover the general store stock of the bankrupt appropriate to the business in which he was engaged. There is nothing definite in the schedules with which to make comparison, the store and yard stock at Susquehanna being there lumped with lumber and mine material (props and ties) at other places, and a value of $8,000 put upon the whole. But the appraisers found about $5,000 worth of property to correspond with it, and, although it realized but $1,546.35 at the trustee's sale, the latter cannot be regarded as anywhere near its real value. The explanation of his original figures given by the bankrupt is that they were made without the aid of an inventory, which he never took or kept, and were, therefore, nothing more than a rough guess, resulting in the overestimate which appears. This, under all the circumstances, I am inclined to credit. The bankrupt was located in a small community, and the stock he had was not of a character to be concealed or disposed of in quantity without observation. Any change in the ordinary course of his business for the

purpose of accomplishing it would have been at once noticed and commented upon, as it was when, a few days before he filed his petition, he refused credit, and began to make sales for cash, taking in barely $200 thereby; and the same is true of any gross depletion of his stock by shipping it off to other points for purposes of concealment. It is much easier to believe that the bankrupt, as he says, was oversanguine and mistaken to the extent of five or six thousand dollars with regard to this part of his property, than that he made away with that amount of it undetected.

The second item relates to outstanding accounts considered good, estimated at $9,000. The open accounts due to the bankrupt at the time of his failure as shown by his ledger amounted to over $18,000; but this is reduced by offsets found in the passbooks of customers to about $7,000, on which the trustee has been able to collect only $425. Whatever may be said with regard to this kind of bookkeeping, it by no means shows fraud. No accounts are shown to have been made over to other parties, or to have been collected by the bankrupt in contemplation of bankruptcy, and not accounted for. Like the estimate of stock on hand, it is simply a case of seeing things extravagantly large. Nor is there any misrepresentation upon this subject in the schedules. All that is there stated is the amount of the accounts (without regard to their collectibility), which is given at $2,000, a figure entirely within the true balance due, after all deductions.

The item which is the subject of most controversy is the standing timber. In his statement the bankrupt declared that he had 3,500,000 feet of this, on which he put a value of $28,000. The timber lots from which this was made up, according to his present testimony, were as follows:

| | | | |
|---|---|---|---|
| Loomis lot, | Windsor, N. Y. | 200 acres | 800,000 ft. |
| Hall " | " " | 50 " | 50,000 " |
| Foster Farm, | " " | 20 " | 250,000 " |
| Darling lot, | " " | 68 " | 300,000 " |
| Bathwick " | McClure's " | 50 " | 200,000 " |
| Clark " | " " | 50 " | |
| Comfort tract, | Harmony, " | 40 " | 100,000 " |
| Barrett lot, | " " | 20 " | 100,000 " |
| Grimes " | Oakland, " | 25 " | 100,000 " |
| Lot at Brushville | | | 100,000 " |

2,000,000 ft.

To this is to be added the timber purchased in September, about the time the statement was made, by contract with Deakin and Hall, as follows:

| | | | |
|---|---|---|---|
| Harding lot | Gibson Township | 80 acres | 1,000,000 ft. |
| Tingley " | " " | 40 " | 1,000,000 " |
| Manzer " | " " | 50 " | 200,000 " |
| Styles " | " " | | |

2,200,000 ft.

Putting these together, they aggregate something over 4,000,000 feet; nominally, at least, fulfilling the terms of the statement. But, accepting the estimate of quantity so given for want of a better, the value placed upon it was of the wildest character. The majority of it

was bought on different contracts with the several owners, on which but little, if any, of the purchase money had been paid; and in the case of the contract with Deakin and Hall, covering one-half of the whole, the timber was practically to be paid for as cut, with provision for judgment and execution in case it was not, the whole contract being forfeited in the event of death or bankruptcy. The Loomis lot had also been transferred two years previously to the bank to whom the statement was made, under some arrangement, by which, although they held the deed for it, the bankrupt was allowed to work the timber; while the Bathwick and Clark lots, the Comfort tract, and the Grimes lot were all assigned to C. W. Deakin to secure him in certain matters, with a similar arrangement as to the cutting. Notwithstanding these conditions and contingencies, and with everything with regard to the property uncertain and prospective, it was treated as a valuable asset worth $28,000. If the bankrupt were being held for a misrepresentation of his financial standing, such reckless figures might operate seriously against him; but they are entirely aside from the present issue. The question here is one of falsification and concealment, in connection with his bankruptcy, which, as to this item of property, is certainly not sustained. All the standing timber held by the bankrupt, or to which he had any claim, is specified in his schedules, whether transferred to others or fully owned by him, and the comparatively moderate value of $6,000 put upon it, so that there can be no charge of misstatement with respect to it. Neither was it of a character to be made away with, and, having been fully identified, as it has now been, it was easily followed up and traced out by those interested if anything was wrong. Whether it has yielded all that it ought to the estate is another question. That depends on how far it was involved in the entanglements referred to. It may not be out of the way, however, in that connection, to note that the two lots conveyed to Jerome Dewitt to secure the First National Bank of Susquehanna in certain matters were turned back by him, the transfer to him having been made a few days prior to bankruptcy; while the different contracts assigned to Deakin and the bank were merely for the purpose of security, on which, if there was a recoverable margin, it was to be looked to. On the Deakin and Hall contracts, moreover, a million feet had been cut (about one-half of what was there), to which, as I understand it, the bankrupt, on payment of a proportionate part of the price, was entitled, and from which it is doubtful whether the provision with regard to a forfeiture in case of bankruptcy could deprive him. But the property, such as it was, is all accounted for in the schedules, and its condition stated, and the bankrupt cannot, therefore, be charged with having falsified or made away with it, however much in his statement to the bank he may have overvalued it.

The showing with regard to the lumber in yards—another item of the statement—which is put at 600,000 feet, is not so satisfactory. The bankrupt, in accounting for this, in his testimony says there was 100,-000 at Gibson, 300,000 (as estimated) at Elkdale, and 150,000 at Cascade Valley. In the schedules the lumber is lumped with other property, and they therefore afford no distinct information with respect to it. The appraisers, so far as I understand their report, found about

200,000 feet at various places, some of it being claimed, however, by other parties, either by assignment as collateral security or because of indebtedness due upon it. This leaves 400,000 as to which we have nothing definite. But considering that the figures relied upon, like the others which have been discussed, were a mere guess, and that the bankrupt was dealing in lumber, and perhaps using it in building, it may well be that this quantity was disposed of in some such way. Two-thirds of his pine was, according to his testimony, and the proportion is likely to have held good as to hemlock and other woods. It is true that the bankrupt does not say so, but the inference may be fairly drawn even if he does not. The other alternative—that he is concealing this part of his property, or has made away with it fraudulently—is not to be assumed without something more definite to support it than we have. It would not have been difficult to have prosecuted inquiries at the different yards where this lumber was said to lie, which would have unquestionably developed whether any such disposition had been made of it. But without any investigation of that kind, so far as appears, the discrepancy in figures is all that is relied upon, which does not seem, under the circumstances, to be enough.

The explanation with regard to the pine lumber—made a separate item, and put in at $3,000—is that there was about 150,000 feet of it, a part of which was at James' Mill, Lanesboro, and another lot at Bennett's. As already noted, two-thirds of it was disposed of, according to the bankrupt, before he failed, and of the rest a part, at least, was found. Some also had gone the way of much of his other property of disposable character as security to C. W. Deakin. An attempt was made to show that there was a considerable margin in the latter, which the bankrupt, through his brother, tried to get the benefit of since the adjudication. But the evidence in that direction did not come up to expectation, and was withdrawn. The incident, however, is suggestive, so far as it goes, for it proves that the bankrupt had no covertly reserved interest in the property which he had transferred in this way, or else he would not have needed the help of another to get it back.

Five hundred tons of bark, valued at $1,500, was also claimed in the statement, and, as none was found by the trustee, nor accounted for by the bankrupt in his testimony, I was inclined at first to feel that the subject had not been cleared up as it should be. But the bankrupt was not asked to explain the item, and was entitled to have his attention specifically called to it if anything was intended to be made of it. I suspect also that this, like the timber, was a mere expectancy; not that he had any such quantity of bark in his hands, but that he calculated to get it when he came to cut and strip his timber. Somewhat confirmatory of this idea, it will be recalled that he put a value of about $1,000 on the bark which was reserved to the owners on the Deakin and Hall lots, where there was supposed to be about 2,000,000 feet of timber; and at the same rate $1,500 would not be far out of the way as the value of that which he was to get from his other contracts.

The props are about in the same situation as the bark. The bankrupt claimed to have 400 cars worth $4,000; while according to his present testimony he only had from 80 to 100. A few were found by

the appraisers, and sold by the trustee, and this may be taken as all that were left undisposed of at that time. Like much of that which the bankrupt relied on, the rest, if anywhere, were "in the woods."

There is no controversy over the odds and ends which remain, but they are not to be altogether left out of sight. The principal item among them is the real estate, valued at $15,000, subject to a mortgage of $4,000, and consisting of six different pieces of property. One of these was disposed of by the bankrupt for $1,200, a month or two before his failure, and the rest, when forced to a sale, were only sufficient to meet the mortgage and other liens.

It is evident from this review of the case that the objections to a discharge cannot be sustained. No specific property is traced into the hands of the bankrupt, reliance—as already stated—being simply placed on the discrepancy between what he represented with regard to his estate and the meager showing now made. But his failure, and the complete dissipation of the little that he had, are readily accounted for upon natural grounds, and there is no occasion for giving them a sinister cast. Some of his business methods have been already commented upon, and there were others equally disastrous. According to his own declaration, he began without any capital to speak of; was led into far too many enterprises; took building contracts at such low figures as almost never to come out whole; had men employed on widely separate jobs, which he could not superintend personally and had no one to supervise; not only borrowed money largely, and paid corresponding interest, but was compelled at the last, in order to keep going, to discount at a loss the securities in which he was paid. To this there could be hardly any other than the one end.

Not satisfied, therefore, that any lawful grounds exist for refusing the bankrupt's application for a discharge, the objections are overruled, and the discharge is allowed.